UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

San Francisco Division

MEGAN SHEEHAN,

          Plaintiff,

    v.

BAY AREA RAPID TRANSIT, et al.,

          Defendants.

Case No.14-cv-03156-LB

**ORDER ON MOTIONS FOR SUMMARY JUDGMENT**

[ECF Nos. 73, 75, 77]

### INTRODUCTION

This is a civil-rights case under the Fourth and Fourteenth Amendments to the U. S. Constitution, 42 U.S.C. § 1983, and California's Bane Act (Cal. Civ. Code § 52.1). (*See generally* Third Am. Compl. ("3AC") – ECF No. 40.)[1] It arises from injuries that plaintiff Megan Sheehan suffered after being arrested for public drunkenness on Saint Patrick's Day. Ms. Sheehan claims that the individual defendants — police officers Nolan Pianta of the Bay Area Rapid Transit District ("BART") and Michael Stolzman of the Oakland Police Department ("OPD") — used excessive force while booking her into jail, essentially throwing her to the floor, and so causing her injuries. She also sues BART and the OPD directly for governmental-policy liability under *Monell v. New York City Dept. of Social Svcs.*, 436 U.S. 658 (1978).

---

[1] Record citations refer to material in the Electronic Case File ("ECF"); pinpoint citations are to the ECF-generated page numbers at the tops of documents.

1    This order addresses three crossing motions for summary judgment. Ms. Sheehan moves for

2 summary judgment on her Fourth Amendment claim against Officer Pianta and her *Monell* claim

3 against BART. (*See* ECF Nos. 75, 75-1 at 2.) BART and Officer Pianta move the court to dismiss

4 all the claims against them (ECF No. 73 at 5), as do the City of Oakland and Officer Stolzman

5 (ECF No. 77 at 1). These motions present four basic questions: 1) Did Officer Pianta use excessive

6 force when he threw Ms. Sheehan to the booking-room floor?; 2) Was Officer Stolzman an

7 "integral participant" in Office Pianta's act?; 3) Is either defendant entitled to qualified immunity

8 from Ms. Sheehan's claims?; and 4) Did BART ratify, or have a policy that allowed, Officer

9 Pianta's conduct?

10    The court denies Ms. Sheehan's motion. The court grants the City of Oakland and Officer

11 Stolzman's motion. The court partly grants and partly denies BART and Officer Pianta's motion.

12 The court specifically holds as follows:

- A jury question exists on whether Officer Pianta used excessive force. The record does not permit a decision as a matter of law for either Ms. Sheehan or BART and Officer Pianta.
- A genuine dispute of material fact prevents the court from deciding whether Officer Pianta is entitled to qualified immunity; the parties' summary-judgment motions are therefore denied on this issue.
- Officer Stolzman, as a matter of law, was not an "integral participant" in the "takedown" that injured Ms. Sheehan.
- BART and the OPD cannot be held liable on a *Monell* ratification theory merely because their post-incident investigations exonerated Officers Pianta and Stolzman.
- There is no evidence that the OPD maintained an unconstitutional policy or custom for *Monell* purposes.
- The plaintiff has not adduced sufficient evidence to raise a triable claim that BART maintained an unconstitutional policy or custom for *Monell* purposes.
- The plaintiff's claim under the Fourteenth Amendment is dismissed with prejudice.
- The plaintiff's claim under California's Bane Act (Cal. Civ. Code § 52.1) tracks the disposition of her Fourth Amendment excessive-force claim.

The court therefore dismisses with prejudice all claims against Officer Stolzman and the OPD. The court dismisses with prejudice Ms. Sheehan's *Monell* claims. Her Fourth Amendment and Bane Act claims will go forward.

United States District Court
Northern District of California

1

**FACTS**

2      St. Patrick's Day 2014 proved to be gravely unhappy for plaintiff Megan Sheehan. She began

3 drinking during her lunch break as a bartender at an Irish bar in downtown San Francisco and

4 continued after her shift ended; by 6:30 p.m. she was sleeping on a bench in the Lake Merritt

5 BART station in Oakland.[2] Which is where BART police found her.[3] There is no dispute that Ms.

6 Sheehan was drunk. Given her intended destination of Walnut Creek, for one thing, she should not

7 have been on the Lake Merritt line.[4] Present purposes do not require going into every last detail,

8 and it will suffice to say that, throughout the events in question, Ms. Sheehan was less than fully

9 cooperative.

10      Ms. Sheehan fought with the first BART officers who dealt with her at the Lake Merritt

11 station, kicking one of them in the shoulder and the side of the face as he tried to handcuff her.[5]

12 She was arrested for obstructing a police officer, willfully resisting a police officer, battery on a

13 police officer, and public intoxication.[6] Officer Pianta — who had not been involved with Ms.

14 Sheehan before this point and who apparently was new enough at BART to be on probationary

15 status — was assigned to drive her to the Santa Rita jail.[7] Officer Pianta videotaped the drive to

16 Santa Rita jail; his interaction with Ms. Sheehan generally was low-key and conversational.

17 Among other things, she reported urinating in the back seat. When they arrived at Santa Rita,

18 Officer Pianta escorted Ms. Sheehan into the jail's booking room. At the jail, Officer Pianta

19 searched Ms. Sheehan's person and purse.[8] Other police officers and their arrestees were already

20 there. Among these were Officers Stolzman and Joel Hight, both of the OPD.

21

22 [2] Sheehan Dep. – ECF No. 74 at 6-12, 23-24 (pp. 18-24, 88-89). Throughout this discussion, citations to depositions carry two page numbers; the first, following the "at," is the ECF-generated page
23 number; the second, following the "p." or "pp.," reflects the original deposition pagination. The citation at the start of this footnote thus refers to document ECF No. 74, ECF pages 6-12 and 23-24,
24 and original deposition pages 18-24 and 88-89.

[3] Trabanino Decl. – ECF No. 73-4 at 3 (¶ 16).

25 [4] Sheehan Dep. – ECF No. 74 at 12 (p. 24).

26 [5] Carrasco Decl. – ECF No. 73-2 at 1-2 (¶¶ 3-4); Trabanino Decl. – ECF No. 73-4 at 2-3 (¶¶ 13-15).

[6] Trabanino Decl. – ECF No. 73-4 at 3 (¶ 16).

27 [7] Pianta Dep. – ECF No. 74 at 28, 47 (pp. 60, 98); *see* ECF No. 83-7 at 224.

28 [8] Pianta Dep. – ECF No. 84-2 at 23 (p. 78).

United States District Court
Northern District of California

United States District Court
Northern District of California

1    Three video cameras recorded the events in the booking room. One camera was on the booking

2    room's ceiling; the other two were the respective body cameras of Officers Stolzman and Hight.

3    The parties agree that the videos accurately reflect the relevant events. This analysis thus relies

4    mainly on those videos. *See Scott v. Harris*, 550 U.S. 372, 378-79 (2007) (using videotape to

5    determine facts in excessive-force case). From her first encounter with the BART officers at Lake

6    Merritt, through to her injury, Ms. Sheehan has almost no memory of the evening. She recalls

7    nothing about what happened in the Santa Rita booking room.[9]

8    The videos show Ms. Sheehan standing uncuffed at the booking-room window (which is much

9    like a traditional bank teller's station), engaging with the person behind the window as part of the

10    booking process. Her purse sits on the counter to her left. Her back is to Officer Pianta, who stands

11    a few feet behind, holding his handcuffs. Ms. Sheehan starts to twist her hair into a ponytail, and

12    Officer Pianta tells her that Santa Rita won't let her take the ponytail holder into the cell. Ms.

13    Sheehan responds, "Oh," and throws (in a slightly drunken way) the ponytail holder at Officer

14    Pianta, who calmly answers, "Really?" Ms. Sheehan then stands for some seconds more at the

15    booking window, still apparently engaging with the person behind the window, and then, with both

16    hands, starts rummaging through her purse. Things now move quickly. Officer Pianta tells her to

17    stop.[10] He steps up from behind and takes hold of either the purse or her left arm (it is hard to tell

18    from the video), obviously trying to stop her from going through the purse. Ms. Sheehan resists,

19    and Officer Pianta says, calmly, "Let go, let go." Ms. Sheehan says (somewhat petulantly and

20    sardonically but not loudly) "oh, my god, you are such a strong . . . ." Then she says, more loudly

21    and animatedly, "Don't touch me like that!" as Officer Pianta puts her left arm in a "pain

22    compliance" hold, from which she squirms mostly free.[11] As she continues to twist in Officer

---

[9] Sheehan Dep. – ECF No. 74 at 14-20 (pp. 26-32).

[10] *E.g.,* Pianta Dep. – ECF No. 79 at 9 (pp. 75-76). It is unclear whether Ms. Sheehan's purse had been searched before her transport to Santa Rita jail. Officer Pianta "believe[s]" that his partner had searched it before he drove to the jail, because that is normal procedure, but he was not certain. (*See* Pianta Dep. – ECF No. 79 at 9 [p. 77].) Officer Pianta searched her purse at the jail before the incident. (*See* Pianta Dep. – ECF No. 84-2 at 23 (p. 78).) He does not remember what was in the purse but testified that he would have secured any weapon that he found. (*Id.* at 23-25 (pp. 78-80).)

[11] ECF No. 83 at 13 ("pain-compliance hold").

United States District Court
Northern District of California

Pianta's grasp, Officer Stolzman steps toward the struggling pair. He removes her purse from the counter. Then, as Ms. Sheehan turns almost fully around, facing Officer Pianta, Officer Stolzman puts the purse on the counter with his left hand while his right hand grips Ms. Sheehan's free forearm. One second after Officer Stolzman touches her, Officer Pianta executes a "takedown" that pulls her from Officer Stolzman's grasp and sends her quickly and forcefully to the floor. (Two of the nearby officers describe Officer Pianta as having done a "leg sweep" on Ms. Sheehan.[12] Officer Pianta says that he used an "arm bar take down" by putting his right hand on Ms. Sheehan's left shoulder and pushing her to the ground while holding on to her left hand with his left hand.[13]) The videos show Ms. Sheehan falling with great speed and landing with an audible thud. The fall knocks her unconscious. She was transported to the hospital, where she remained for two days with a concussion, a "blowout" fracture of the orbital bone beneath her left eye, and other facial injuries.

The main material dispute in all this concerns whether Ms. Sheehan punched or tried to punch Officer Pianta. The latter claims that she did.[14] Officer Stolzman, too, testified that Ms. Sheehan had punched Officer Pianta and explains that he stepped into the tussle to stop her blows.[15] Three other officers who were in the booking room also testified about what they saw: one described a "swing" intended to strike Officer Pianta (but couldn't tell whether it was closed fist or open palm); one described "the beginning stages of what I could interpret as a punch"; and one said that Ms. Sheehan punched Officer Pianta.[16] The videos do not show conclusively whether Ms. Sheehan threw any punches. Both parties focus on one frame, from the ceiling camera, in which her arm is raised above her head. The police officers contend that this shows her throwing a punch, while Ms. Sheehan insists that it does not show this — at least not definitively.[17] The video is not conclusive

---

[12] Hight Dep. – ECF No. 74 at 151 (pp. 17-19); Carter Dep. – ECF No. 74 at 163, 167 (pp. 14, 30).

[13] Pianta Dep. – ECF No. 74 at 60-61 (pp. 127-28.)

[14] Pianta Dep. – ECF No. 74 at 52, 54, 58 (pp. 108, 110, 118).

[15] Stolzman Dep. – ECF No. 84-2 at 59-60 (pp. 64-66).

[16] Philliips Dep. – ECF No. 74 at 96-97 (pp. 15-16); Hight Dep. – ECF No. 74 at 152-54 (pp. 15-17); Carter Dep. – ECF No. 74 at 162-63 (pp. 13-14).

[17] ECF No. 88 at 9.

but it looks like Ms. Sheehan's arm went up as she pivoted to possibly shake off Officer Pianta; the court cannot really tell whether this "swing" is a punch.[18] What is not disputed is that, when Officer Stolzman stepped in to help Officer Pianta control Ms. Sheehan, the latter were physically struggling with one another.

Other significant facts are undisputed. The videos show that Officer Pianta is visibly a good bit larger than Ms. Sheehan: he is 6'4" and 250 pounds, and she appears to be a slender young woman.[19] Officer Stolzman did not know whether Ms. Sheehan's purse had been searched.[20] Officers Pianta and Stolzman did not know each other before these events; they did not communicate with each other during the incident; and they did not plan or coordinate with each other to subdue Ms. Sheehan.[21] Officer Stolzman was unaware that Officer Pianta was going to take Ms. Sheehan to the ground.[22] The videos show that, during the whole relevant period, there were four police officers in the booking room in addition to Officer Pianta; all were within steps of Officer Pianta and Ms. Sheehan.

BART and the OPD both investigated the incident. Each department cleared its officer of wrongdoing. BART determined that Officer Pianta had acted within BART's use-of-force guidelines; OPD similarly cleared Officer Stolzman.

## SUMMARY-JUDGMENT LAW

The court must grant a motion for summary judgment if the movant shows that there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). Material facts are those that may affect the outcome of the case. *Anderson*, 477 U.S. at 248. A dispute about

---

[18] *See* Whent Dep. – ECF No. 91-1 at 20 (p. 56).

[19] Pianta Dep. – ECF No. 84-2 at 19 (p. 14). Officer Pianta estimated Ms. Sheehan to be 5'-9" tall and to weigh 145 pounds. (*See* ECF No. 84-2 at 46.)

[20] Stolzman Dep. – ECF No. 80 at 10-11 (pp. 33-35).

[21] Stolzman Dep. – ECF No. 80 at 7, 11-12, 16 (pp. 19, 34-41, 68); Pianta Dep. – ECF No. 79 at 7 (p. 60).

[22] Stolzman Dep. – ECF No. 80 at 16 (pp. 67-68).

United States District Court
Northern District of California

a material fact is genuine if there is sufficient evidence for a reasonable jury to return a verdict for the non-moving party. *Id.* at 248-49.

The party moving for summary judgment bears the initial burden of informing the court of the basis for the motion, and identifying portions of the pleadings, depositions, answers to interrogatories, admissions, or affidavits that demonstrate the absence of a triable issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). To meet its burden, "the moving party must either produce evidence negating an essential element of the nonmoving party's claim or defense or show that the nonmoving party does not have enough evidence of an essential element to carry its ultimate burden of persuasion at trial." *Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Companies, Inc.*, 210 F.3d 1099, 1102 (9th Cir. 2000); *see Devereaux v. Abbey*, 263 F.3d 1070, 1076 (9th Cir. 2001) ("When the nonmoving party has the burden of proof at trial, the moving party need only point out 'that there is an absence of evidence to support the nonmoving party's case.'") (quoting *Celotex*, 477 U.S. at 325).

If the moving party meets its initial burden, then the burden shifts to the non-moving party to produce evidence supporting its claims or defenses. *Nissan Fire & Marine Ins. Co., Ltd.*, 210 F.3d at 1103. The non-moving party may not rest upon mere allegations or denials of the adverse party's evidence, but instead must produce admissible evidence that shows there is a genuine issue of material fact for trial. *See Devereaux*, 263 F.3d at 1076. If the non-moving party does not produce evidence to show a genuine issue of material fact, the moving party is entitled to summary judgment. *See Celotex*, 477 U.S. at 323.

In ruling on a motion for summary judgment, inferences drawn from the underlying facts are viewed in the light most favorable to the non-moving party. M*atsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). More precisely, "[a]t the summary judgment stage, facts must be viewed in the light most favorable to the nonmoving party only if there is a 'genuine' dispute as to those facts." *Scott*, 550 U.S. at 380.

# ANALYSIS

## 1.   Excessive Force — Fourth Amendment — 42 U.S.C. § 1983

### 1.1 Governing law

"The Fourth Amendment requires police officers making an arrest to use only an amount of force that is objectively reasonable in light of the circumstances facing them." *Blankenhorn v. City of Orange,* 485 F.3d 463, 481 n.12 (9th Cir. 2007) (citing *Tennessee v. Garner,* 471 U.S. 1, 7-8 (1985)); *accord, e.g., Arpin v. Santa Clara Valley Transp. Agency,* 261 F.3d 912, 921 (9th Cir. 2001) ("A claim against law enforcement officers for excessive force is analyzed under the Fourth Amendment's 'objective reasonableness' standard."). Section 1983 provides a private right of action for those whose federal constitutional or statutory rights are deprived under color of law. *See* 42 U.S.C. § 1983; *see generally, e.g., Monteilh v. Cnty. of Los Angeles*, 820 F. Supp. 2d 1081, 1089 (C.D. Cal. 2011).

"Determining whether the force used to effect a particular seizure is reasonable under the Fourth Amendment requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Graham v. Connor*, 490 U.S. 386, 396 (1989) (internal citations and quotations omitted). To do so, a court must evaluate the facts and circumstances of each particular case, including 1) the severity of the crime at issue, 2) whether the suspect poses an immediate threat to the safety of the officers or others, and 3) whether she is actively resisting arrest or attempting to evade arrest by flight. *Id.* "The 'most important' factor under *Graham* is whether the suspect posed an 'immediate threat to the safety of the officers or others.'" *Bryan v. MacPherson*, 630 F.3d 805, 826 (9th Cir. 2010) (quoting *Smith v. City of Hemet*, 394 F.3d 689, 702 (9th Cir. 2005) (*en banc*)). "A simple statement by an officer that he fears for his safety or the safety others is not enough; there must be objective factors to justify such a concern." *Bryan*, 630 F.3d at 826 (quoting *Deorle v. Rutherford*, 272 F.3d 1272, 1281 (9th Cir. 2001)). "These factors, however, are not exclusive. Rather, [the court must] examine the totality of the circumstances and consider 'whatever specific factors may be appropriate in a particular case, whether or not listed in *Graham.*'" *Bryan*, 630 F.3d at 826 (quoting *Franklin v. Foxworth*, 31 F.3d 873, 876 (9th Cir. 1994)). "In some cases," for

United States District Court
Northern District of California

example, "the availability of alternative methods of . . . subduing a suspect may be a factor to consider." *Smith*, 349 F.3d at 701 (citing *Chew v. Gates*, 27 F.3d 1432, 1441 n. 5 (9th Cir. 1994)).

"The reasonableness of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham*, 490 U.S. at 396 (citing *Terry v. Ohio*, 392 U.S. 1, 20-22 (1968)). "'Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers,' *Johnson v. Glick*, [481 F.2d 1028, 1033 (2d Cir. 1973)], violates the Fourth Amendment." *Graham*, 490 U.S. at 396. This is because "[t]he calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments — in circumstances that are tense, uncertain, and rapidly evolving — about the amount of force that is necessary in a particular situation." *Id.*

### 1.2 Excessive force — Officer Pianta

On the one hand, Ms. Sheehan certainly had a Fourth Amendment interest in not being needlessly roughed up and injured, perhaps especially when her obvious drunkenness made her — uncooperative, yes, but also vulnerable. On the other hand, Officer Pianta had a legitimate interest in keeping Ms. Sheehan under control and, more important, ensuring that she presented no danger to him, herself, or others. But that is only a rough first pass. The more specific elements of the *Graham* analysis cast a more precise and so more revealing light on the situation.

First, the severity of the crime. The root charge was public intoxication — not necessarily the most profound crime — but made worse here by Ms. Sheehan's having physically fought with the BART officers who initially dealt with her. Second, while in the Santa Rita booking room, Ms. Sheehan had not actively resisted Officer Pianta. She was uncooperative but, by the time she was at the booking window, this manifested mostly in her tossing a hair tie at Officer Pianta. She continued rummaging through her purse after Officer Pianta told her to stop. But that alone would not reasonably justify throwing her to the ground. It is only when Officer Pianta twists her arm in a "pain compliance" hold that Ms. Sheehan starts to actively resist. Was Officer Pianta then reasonably entitled to take her forcefully to the ground? This leads to the "most important" *Graham* factor: whether Ms. Sheehan "posed an immediate threat to the safety of the officers or

1    others." *Bryan*, 630 F.3d at 826 (quotation omitted). The undisputed facts make it hard to see that

2    she posed much of a threat. At least not one that reasonably justified the treatment that she

3    received. The videos and other evidence show that Officer Pianta was physically a good bit larger

4    than Ms. Sheehan. They were moreover in the relative safety of the Santa Rita jail. He had already

5    searched her purse. And, during the whole incident, there were at least four other uniformed police

6    officers nearby — indeed, within steps of him and Ms. Sheehan. Which raises the question of

7    alternatives. A jury could look at the undisputed facts and fairly conclude that Officer Pianta had

8    other options to gain control of Ms. Sheehan more safely. He could have allowed Officer Stolzman

9    to help him more gradually subdue her. Failing that, he could have asked for help from the

10   multiple nearby officers.

11        The court would emphasize that, in its view, weighing these facts is not to judge by hindsight;

12   it is rather to consider the facts that confronted Officer Pianta at the time. It must be remembered

13   too that, "[e]ven where some force is justified, the amount actually used may be excessive."

14   *Blankenhorn*, 485 F.3d at 477 (quoting *Santos v. Gates*, 287 F.3d 846, 853 (9th Cir. 2002)). "The

15   question in all cases is whether the use of force was 'objectively reasonable in light of the facts

16   and circumstances confronting' the arresting officer[]." *Blankenhorn*, 485 F.3d at 477 (quoting

17   *Graham*, 490 U.S. at 397). It may thus be conceded — it probably cannot be denied — that

18   Officer Pianta could constitutionally exert some force to bring Ms. Sheehan under control. That

19   does not mean that his force might not have been excessive, and that a jury should not be called on

20   to settle the question.

21        Ultimately, the indeterminate issue of the punching and the reasonableness of Officer Pianta's

22   response prevent the court from ruling for either party as a matter of law. The evidence before the

23   court leaves a genuine dispute over whether Ms. Sheehan was punching or trying to punch Officer

24   Pianta or if Officer Pianta reasonably perceived that she was trying to punch him. The seconds-

25   long encounter on a video does not show a punch (though the court cannot say as a matter of law

26   that the video is inconsistent with one either because Ms. Sheehan's arm is in the air briefly).

27   Officers testify varyingly about what Ms. Sheehan did, and the video evidence does not always

28   support their accounts. Also, different officers described Officer Pianta's takedown differently than

United States District Court
Northern District of California

he does (leg sweep versus arm-bar takedown). The court does not mean to suggest anything nefarious by this observation: eyewitnesses often give varying accounts; that is normal. But there are genuine issues of material fact about what happened. The reasonableness of Officer Pianta's response is a jury question too — even if the takedown went wrong. *Cf. Blankenhorn*, 485 F.3d at 480 ("[I]t is the need for force that is at the heart of the *Graham* factors."). And to the point, having transported Ms. Sheehan, Officer Pianta knew more about her risk (or lack thereof) than anyone there. His testimony needs to be heard to be credited, given that the video establishes a genuine issue about whether the force that Officer Pianta used was reasonable under the circumstances.[23] The court cannot say as a matter of law that his conduct is either objectively reasonable or unreasonable. The court therefore denies both Ms. Sheehan's, and BART and Officer Pianta's, motions for summary judgment on the excessive-force claim.

### 1.3 Officer Stolzman was not an "integral participant"

The undisputed facts show that Officer Stolzman had only fleeting involvement in the events that led to Ms. Sheehan's injury. Ms. Sheehan does not contend that Officer Stolzman himself used excessive force. She argues instead that Officer Stolzman was an "integral participant" in Officer Pianta's takedown. (ECF No. 84-1 at 10-13.) She would thus piggyback Officer Stolzman's otherwise rightful conduct onto the allegedly wrongful force used by Officer Pianta. The court does not think that she can do so.

"An officer's liability under 42 U.S.C. § 1983 is predicated on his 'integral participation' in the alleged [constitutional] violation." *Blankenhorn,* 485 F.3d at 481 n.12 (citing *Chuman v. Wright,* 76 F.3d 292, 294–95 (9th Cir. 1996)). The "integral participant" rule "extends liability to those actors who were integral participants in the constitutional violation, even if they did not directly engage in the unconstitutional conduct themselves." *Hopkins v. Bonvicino,* 573 F.3d 752, 770 (9th Cir. 2009). Integral participation "does not require that each officer's actions themselves

---

[23] Oakland Police Chief Whent, for example, testified that Officer Pianta's force was "problematic," noting that while Ms. Sheehan was not compliant, "there was not sufficient urgency to move to that level of the use of force." (Whent Dep.– ECF No. 91-1 at 11 (p. 27).)

United States District Court
Northern District of California

rise to the level of a constitutional violation." *Blankenhorn,* 485 F.3d at 481 n.12 (quoting *Boyd v. Benton Cnty.*, 374 F.3d 773, 780 (9th Cir. 2004)). "But it does require some *fundamental involvement* in the conduct that allegedly caused the violation." *Blankenhorn,* 485 F.3d at 481 n.12 (citing *Boyd,* 374 F.3d at 780) (emphasis added).

The facts concerning Officer Stolzman are undisputed. The video footage, in particular, is entirely consistent with how Officer Stolzman describes his conduct. Officer Stolzman did essentially two things: He held Ms. Sheehan's purse and then gripped her forearm. He did not know whether her purse had been searched for weapons. And, regardless of whether Ms. Sheehan was trying to punch Officer Pianta, there is no dispute that the two were physically tussling. This is obvious from the videos. Officers Pianta and Stolzman did not know each other before this incident; they had come to the Santa Rita jail from different incidents with different arrestees. They did not communicate with each other before Officer Pianta took Ms. Sheehan to the ground. Much less did they plan to subdue her — in this or any other way. *See Hopkins*, 573 F.3d at 770 (reversing denial of summary judgment and holding that police officer was not integral participant where, among other things, he did not "participate[] in . . . planning . . . the unlawful search"). Officer Stolzman was unaware that Officer Pianta was about to take Ms. Sheehan down. *See Boyd*, 374 F.3d at 780 (holding that every officer involved in search could be liable because "every officer was aware of the decision to use the flash-bang [grenade] . . . and participated in the search knowing the flash-bang was to be deployed"). Last, but far from least, Officer Stolzman was in contact with Ms. Sheehan for approximately one second. He had barely gripped her forearm when Officer Pianta sent her to the floor. The videos confirm that only one second passed and, qualitatively, they convey how suddenly Ms. Sheehan slams to the floor.

On these undisputed facts no reasonable juror could find that Officer Stolzman "integrally participated" in Officer Pianta's takedown. His brief contact with Ms. Sheehan's forearm was not "instrumental" to that takedown. *Cf. Blankenhorn*, 485 F.3d at 481-82 n. 12. Nor was his "physical participation in the alleged violation . . . part of a closely related series of physical acts leading to the violation." *See Monteilh v. Cnty. of Los Angeles*, 820 F. Supp. 2d 1081, 1090 n. 10 (C.D. Cal. 2011) (cited at Pl. Opp. – ECF No. 84-1 at 13). More precisely, his and Officer Pianta's acts were

"closely related" in time only, only in that they were contemporaneous. Causally, effectively, they were so distinct from one another as to be almost two separate events. The undisputed evidence shows Officer Stolzman touching Ms. Sheehan for a moment, and then Officer Pianta suddenly taking her down.

Given the circumstances that Officer Stolzman confronted — the unknown contents of the purse and the physical tussle — the little that he did was constitutionally innocuous, and must be deemed so as a matter of law. It would be a dangerous disincentive to police officers if this level of conduct could support liability. Police would be dissuaded from taking even minimal steps to avert danger to themselves or others. That result would be at odds with established Fourth Amendment law, which calls people's safety the "most important factor" in judging the constitutional limits of force. *See, e.g., Bryan*, 630 F.3d at 826.

### 1.3.1   *Mendez v. Montour*

The decision in *Mendez v. Montour*, No. 12-cv-04170-WHO, 2014 WL 1218665 (N.D. Cal. Mar. 21, 2014) is analogous to this case. The *Mendez* court granted summary judgment to a police officer in almost the same position as Officer Stolzman. The *Mendez* court held, as a matter of law, that the officer had not integrally participated in his partner's tackling an arrestee and slamming his head into a patrol car. *Id.* at *3-4.

The plaintiff in *Mendez* was injured when two California Highway Patrol officers arrested him for driving without a license and under the influence. *Id.* at *1. The plaintiff sued both officers for excessive force. The defendant that we are interested in — Officer Anderson — was sued as an "integral participant" in his partner's use of allegedly excessive force. After being tested for sobriety, the plaintiff "was instructed to place his hands on his head." *Id.* at 1. He did so. Officer Anderson took his left hand and began to handcuff him. *Id.* When the plaintiff removed his right hand from his head, Anderson's partner "swept the [plaintiff's] legs from him" and tackled him to the ground. *Id.* at 1, 4. The fall broke the plaintiff's wrist. *Id.* The partner then shoved the plaintiff into the patrol car, causing him to "slam his head" into it. *See id.* at *1, *3-4.

The district court held that Anderson had not integrally participated in his partner's use of force. *Id.* at *4. The court reasoned: "Anderson had control of [the plaintiff's] left hand and cuffed it, but . . . it was [the partner] who tackled him and attempted to get 'control of his hands.'" *Id.* at 3. It was also the partner who "took out Mendez's legs, causing Mendez to land on his uncuffed right hand (the hand that was broken)." *Id.* Finally, it was again the partner, not Anderson, "who pushed Mendez into the patrol car," where he hit his head on the vehicle. *Id.* at *4. "As to Anderson's 'integral participation,'" the court wrote, "there is no evidence in the record that creates a material issue of fact concerning Anderson's role in Mendez's arrest." *Id.* at *3. "[T]here is no evidence that Anderson *authorized, knew in advance, encouraged, or otherwise helped* [his partner] take down Mendez or slam Mendez into the patrol car." *Id.* at 4. "[T]here was no plan to injure Mendez," and no evidence that Anderson himself had used excessive force. *Id.* at *1. Consequently, there was "simply no evidence that could raise a question of fact that Anderson meaningfully participated in [his partner]'s alleged use of excessive force." 4. The court thus granted summary judgment in Anderson's favor. *Id.*

This court agrees that *Mendez* reached the correct decision on the facts that were before it and thinks that the same conclusion must obtain here. Here, too, there was no "plan" to subdue Ms. Sheehan. Officers Stolzman and Pianta did not know each other or communicate before Officer Pianta suddenly took Ms. Sheehan to the ground. There is "no evidence" that Officer Stolzman "authorized, knew in advance, or encouraged" Officer Pianta to do what he did. And, while Officer Stolzman briefly had hold of Ms. Sheehan's one forearm, as in *Mendez*, it was Officer Pianta alone who applied the force that took her to the ground and injured her. The court therefore holds, as a matter of law, that Officer Stolzman was not an integral participant in Officer Pianta's allegedly unconstitutional use of force.[24]

---

[24] This court reached a basically similar decision in *Brown v. City and Cnty. of San Francisco*, 2014 WL 1364931 (N.D. Cal. Apr. 7, 2014). The court there held that an officer who had helped to apply leg shackles, but otherwise had minimal contact with the prisoner, did not "integrally participate" in the allegedly unconstitutional conduct. *See id.* at *2, *10-11.

### 1.3.2   The plaintiff's arguments and analogies

Ms. Sheehan questions the factual correctness and *bona fides* of Officer Stolzman's stated reason for gripping her forearm. Officer Stolzman testified that he did this to stop her from punching Officer Pianta. Whether or not she punched or tried to punch the BART officer is, again, the parties' main material factual dispute; as best the court can discern, the videos provide no basis for deciding conclusively one way or the other. This question, and the related question of whether Officer Pianta acted reasonably, must be left for the fact-finder. At the summary-judgment hearing, Ms. Sheehan pointed out that a jury might agree with her and find that she had not punched Officer Pianta. Officer Stolzman would be found incorrect in his factual perception; and, according to Ms. Sheehan, his "false allegations" about the punches "suggest a consciousness of guilt." (ECF No. 84-1 at 8.) Although she never says so, the structure of her discussion suggests that Ms. Sheehan views this point as helping to raise a jury question on whether Officer Stolzman participated integrally in the takedown. (*See id.* at 6-8.)

The court disagrees. First, a police officer's subjective intentions are irrelevant to deciding whether he used excessive force. *See Graham*, 490 U.S. at 397-99 ("[T]he subjective motivations of the individual officers . . . ha[ve] no bearing on whether a particular seizure is 'unreasonable' under the Fourth Amendment."). Speculating that a (possible) factual error bespeaks a "guilty conscience" thus does nothing to raise a triable issue on integral participation. The alleged punches moreover are not the only element in play. Even if a jury decided that Ms. Sheehan did not punch or try to punch Officer Pianta, there would remain the undisputed facts of the purse, the struggle, and the objectively little that Officer Stolzman knew or did. Again, it is undisputed that Officer Stolzman did not know whether the purse had been searched; it is undisputed that Ms. Sheehan and Officer Pianta were physically tussling (regardless of whether she threw any punches); and it is undisputed that Officer Stolzman held her forearm for only one second. Even if Ms. Sheehan did not throw punches, in other words, the undisputed facts show beyond plausible dispute that Officer Stolzman did not integrally participate in the takedown.

The plaintiff also suggests that, by holding onto her forearm, Officer Stolzman may have prevented her from breaking her fall. To support this hypothesis, she cites the testimony of BART

1    Sergeant Szopinki. Sergeant Szopinski was not involved in arresting or booking Ms. Sheehan; he

2    is the BART supervisor who investigated Officer Pianta's use of force. After reviewing video

3    footage of the event (apparently only the jail footage, which is not continuous (unlike the body

4    cameras) and instead is composed of still frames),[25] Sergeant Szopinski described Officer

5    Stolzman as "the officer [who] was attempting to help . . . Officer Pianta in taking her down . . . ."

6    (ECF No. 84-2 at 38 [pp. 82-83].) He continued (in the passage that Ms. Sheehan cites): "I believe

7    if that did not occur [*i.e.,* if Officer Stolzman had not grabbed her forearm], she would have had

8    time to protect herself. It's human instinct to put your hand in front when you fall." (*Id.* at 38 [p.

9    83].) Further on, he is more qualified: "Based on the video that I saw, . . . [Officer Stolzman]

10   slightly deflected her right arm which may have caused her to prevent her [*sic*] from breaking her

11   fall." (*Id.* at 38 [p. 84].)

12        This does not raise a triable issue on whether Officer Stolzman was "fundamentally involved"

13   in Officer Pianta's takedown. First, Sgt. Szopinski's assessment that Officer Stolzman was trying

14   to "assist Officer Pianta in taking her down" is just that: his own assessment. It is a characterizing

15   inference that goes subtly but crucially past what the undisputed evidence shows. The videos and

16   the various officers' testimony certainly show Officer Stolzman generally moving to "help"

17   Officer Pianta. There is no doubt of that. But the evidence does not imply the critical further step

18   that Sgt. Szopinski makes and that Ms. Sheehan accepts: that Officer Stolzman tried to help *take*

19   *Ms. Sheehan down*. That is a different thing, and it is a difference that is critical to this case.

20   Sergeant Szopinski is in no better position than the court or jury to make this extended inference

21   from the raw facts. The court has considered Sgt. Szopinki's testimony. But in deciding whether

22   there is sufficient proof that Officer Stolzman "integrally participated" in the takedown, the court

23   cannot be bound by the terms that the sergeant used to describe what he saw or the intentions that

24   he reads beneath Officer Stolzman's manifest conduct. What the court must assess is Officer

25   Stolzman's objective conduct — the things that he actually did — and those are undisputed. For

26   the reasons already stated, as a matter of law, those minimal acts do not constitute integral

27

28   [25] The discussion at oral argument was that the frames are every two seconds.

1   participation. Furthermore, the "could have broken her fall" theory constitutes backward-looking

2   speculation. (*See* ECF No. 84-2 at 38 [p. 84].) That is a decisional mode that the court is not

3   permitted. From Officer Stolzman's perspective at the time, *Graham*, 490 U.S. at 396, the little

4   that he did — briefly taking her purse and momentarily holding her forearm — did not

5   "fundamentally involve" him in throwing Ms. Sheehan to the ground.

6       The plaintiff also argues that Officer Stolzman was "instrumental" to Officer Pianta's

7   takedown. (ECF No. 84-1 at 11.) In this connection she cites *Blankenhorn*, in which the Ninth

8   Circuit found that an Officer Kayano's "participation was integral to the use of hobble restraints"

9   — the latter being one of the acts that the *Blankenhorn* plaintiff claimed was excessive. (*Id.*)

10  (quoting *Blankenhorn*, 485 F.3d at 481-82 n.12). But Officer Kayano's activity in *Blankenhorn*

11  was significantly more purposeful, persistent, and forceful than what Officer Stolzman

12  undisputedly did here. Upon seeing a group of other officers piled on Blankenhorn, Kayano ran

13  over and "grabbed and held Blankenhorn's left arm so it could be handcuffed." *Id.* at 469 n. 3.

14  Kayano "could not remember" whether he or another officer had handcuffed the plaintiff, he "was

15  certain that the handcuffs used were his own." *Id.* In this situation, Officer Kayano's "own

16  declaration indicate[d] that his help in handcuffing Blankenhorn was instrumental in the officers'

17  gaining control of Blankenhorn, which culminated in [another officer's allegedly excessive]

18  application of hobble restraints." *Id.* at 481-82 n. 12. The situation in this case is sufficiently

19  different to warrant a different result. Officer Stolzman's contact with Ms. Sheehan was not as

20  extensive, determined, or as forceful as Officer Kayano's appears to have been in *Blankenhorn*.

21  And, unlike Officer Kayano's "own declaration" in *Blankenhorn*, Officer Stolzman's testimony

22  does not show that he was joining the fray in order to help take her down — that is, to help effect

23  the allegedly unconstitutional conduct. To the contrary. Officer Stolzman explained that he gripped

24  Ms. Sheehan's forearm only to stop her from trying to punch Officer Pianta.

25      Last in this area, Ms. Sheehan argues that Officer Stolzman's physical contact with her alone

26  yields integral participation. She writes that being "hands on . . . constitutes integral participation,

27  *per se*." (ECF No. 84-1 at 11.) To this assertion she attaches a block quote from *Green v. City and*

28  *Cnty. of San Francisco*, 751 F.3d 1039, 1051 (9th Cir. 2014), in which the Ninth Circuit found a

United States District Court
Northern District of California

1    jury question on whether a police sergeant had integrally participated in his colleagues' use of

2    allegedly excessive force.

3         For several reasons, Ms. Sheehan's argument in this regard does not quicken her integral-

4    participation claim against Officer Stolzman. First, *Green* does not stand for the proposition that

5    being "hands on" with someone "constitutes integral participation *per se*." Nothing in *Green* even

6    starts to suggest that that is the rule. *See Green*, *passim*. Second, even as a factual description,

7    saying that Officer Stolzman was "hand on" leaves too much unsaid. It is accurate only in the most

8    superficial way, and leaves out almost every sort of factual detail that case law in this area has

9    treated as relevant. It says too little while implying too much. Had Officer Stolzman only touched

10   Ms. Sheehan's shoulder, and asked her to calm down, he still would have been "hands on." Would

11   that have constituted "integral participation *per se*"? On Ms. Sheehan's view it may have, but the

12   law does not support that view.

13        Finally, the relevant defendant in *Green*, Sergeant Kim, against whom a triable integral-

14   participation claim was found to exist, was much more involved in the challenged activity than

15   Officer Stolzman was here. The *Green* plaintiff sued for excessive force after being erroneously

16   pulled over for driving a stolen car (the police had misread her license plate). She was made to

17   kneel, and was handcuffed, while at least four police officers pointed guns at her. *Green*, 751 F.3d

18   at 1042-44. Sergeant Kim argued that he could not be liable as an integral participant "because he

19   was not one of the officers who pointed his gun at [the plaintiff] while she was in handcuffs." *See

20   id.* at 1051. The district court agreed and granted Sergeant Kim summary judgment but the Ninth

21   Circuit reversed. *Id.* at 1044, 1051. The appellate court reasoned that Sergeant Kim had

22   "misconstrue[d] the circumstances" underlying the plaintiff's claim. *Id.* at 1051. For one thing,

23   "[t]he only reason Sergeant Kim was not pointing his weapon at Green while she was restrained is

24   that he was the one restraining her." *Id.* Further, Sergeant Kim had played an "active" role in the

25   events leading to her detention. He had followed her car without visually confirming that the

26   license-plate number was indeed the one reported stolen. *Id.* at 1043. He decided that pulling her

27   over would present a "high risk" stop and so called for backup. *Id.* He pulled her over. *Id.* He

28

United States District Court
Northern District of California

"took charge in issuing commands" to the other officers. *Id.* And he handcuffed her. *Id.* The Ninth Circuit concluded:

> Even if Sergeant Kim was not one of the officers actually holding Green at gunpoint once she was restrained, he was plainly an active participant in this activity and a jury could find that he was an "integral participant" under *Blankenhorn.*

*Id.* The same cannot be said of Officer Stolzman on the different facts of this case. *Green* does not indicate that Ms. Sheehan's integral-participation claim against Officer Stolzman can go to a jury.

Because the court has concluded that Officer Stolzman did not integrally participate in Officer Pianta's taking Ms. Sheehan to the ground, the court does not reach Officer Stolzman's contention that he enjoyed qualified immunity.

### 2. Qualified immunity — Office Pianta

Regardless of whether he used excessive force, Officer Pianta contends that he enjoys qualified immunity from suit. (ECF No. 73 at 18-21.) For her part, Ms. Sheehan seeks a summary judgment that Officer Pianta is not immune. (*See* ECF No. 75-1 at 14-15.) The court denies both motions.

"Qualified immunity shields public officials from civil damages for performance of discretionary functions." *Mueller v. Auker*, 576 F.3d 979, 992 (9th Cir. 2009). "It is 'an *immunity from suit* rather than a mere defense to liability; and like an absolute immunity, it is effectively lost if a case is erroneously permitted to go to trial.'" *Id.* (quoting *Mitchell v. Forsyth,* 472 U.S. 511, 526 (1985)) (emphasis in original). Qualified immunity will protect an officer from suit "when he or she 'makes a decision that, even if constitutionally deficient, reasonably misapprehends the law governing the circumstances.'" *Mueller*, 576 F.3d at 992 (quoting *Brosseau v. Haugen,* 543 U.S. 194, 198 (2004)). "Qualified immunity protects 'all but the plainly incompetent or those who knowingly violate the law.'" *Mueller*, 576 F.3d at 992 (quoting *Malley v. Briggs,* 475 U.S. 335, 341 (1986)). "The standard is an objective one that leaves 'ample room for mistaken judgments.'" *Mueller*, 576 F.3d at 992 (quoting *Malley,* 475 U.S. at 343). The Supreme Court has "repeatedly .

United States District Court
Northern District of California

1    . . stressed the importance of resolving immunity questions at the earliest possible stage in

2    litigation." *Hunter v. Bryant,* 502 U.S. 224, 227 (1991)).

3        To determine whether Officer Pianta is immune from suit, the court must answer two

4    questions. The court must consider "whether the official's conduct violated a constitutional right,

5    and if so, whether that right was clearly established at the time of the event in question." *Mueller*,

6    576 F.3d at 993) (citing *Saucier v. Katz*, 533 U.S. 194, 206 (2001)); *accord, e.g., Pearson v.*

7    *Callahan*, 555 U.S. 223, 232 (2009). It is not "mandatory" to address these two prongs in this

8    order. *Pearson*, 555 U.S. at 232-36. Courts are to "exercise their sound discretion in deciding

9    which prong . . . should be addressed first in light of the particular circumstances of the case at

10   hand." *Id.* at 236; *accord Mueller*, 576 F.3d at 993-94. Furthermore, "the [qualified-immunity] test

11   is not simply a reiteration of the *Graham* [excessive-force] test . . . : rather, [the court] must

12   determine whether, in using excessive force, the officer made a 'reasonable mistake[ ] as to the

13   legality of [his] actions.'" *Deorle*, 272 F.3d at 1285 (quoting *Saucier*, 533 U.S. at 206).

14

15   **2.1 First prong: Constitutional violation**

16       The court has already concluded that it cannot determine as a matter of law whether Officer

17   Pianta violated Ms. Sheehan's Fourth Amendment rights. Following the Ninth Circuit's approach

18   in the face of a similarly contested key fact, the court will therefore proceed to the second prong of

19   the *Saucier* test. *See Mueller*, 576 F.3d at 994.

20       Before doing that, though, it may be worth noting our governing appellate court's statement

21   concerning the relationship between the underlying excessive-force decision and the first prong of

22   the qualified-immunity test. Again in *Mueller*, *supra*, the Ninth Circuit explained that cases could

23   deny summary judgment to both parties on these points — as the present case does. The *Mueller*

24   court wrote:

25           We note that summary judgment with respect to the first prong of the test for
         qualified immunity under *Saucier*[,533 U.S. at 206], on one hand, and summary
26       judgment on the merits of whether an officer actually violated a plaintiff's rights,
         on the other, are quite different. It does not follow that a denial of summary
27       judgment to an officer on *Saucier's* first prong of qualified immunity — looking at
         the facts favorably to the plaintiff-necessarily determines that the plaintiff must

28

United States District Court
Northern District of California

prevail at summary judgment on this issue on the merits of the claim — looking at the facts favorably to the officer. The difference is subtle, but exquisitely important.

*Mueller*, 576 F.3d at 986 n. 1.

### 2.1 Second prong: Clearly established

"The dispositive question in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Saucier,* 533 U.S. at 202. Put differently, "[f]or a constitutional right to be clearly established, its contours must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Gravelet-Blondin v. Shelton*, 728 F.3d 1086, 1092-93 (9th Cir. 2013) (quoting *Hope v. Pelzer,* 536 U.S. 730, 739 (2002)). "This inquiry 'must be undertaken in light of the specific context of the case, not as a broad general proposition.'" *Mueller* at 994 (quoting in part *Saucier*, 533 U.S. at 201); *accord, e.g., Deorle*, 272 F.3d at 1278-79 ("[T]he court must . . . determine whether the right violated was clearly established in a 'particularized . . . sense . . . .'").

Facing "competing motions for summary judgment," moreover, in the qualified-immunity assessment, the court reads disputed facts in the light most favorable to Ms. Sheehan. *See Mueller*, 576 F.3d at 982, 994; *Blankenhorn*, 485 F.3d at 477 ("Where [material factual] disputes exist, summary judgment is appropriate only if Defendants are entitled to qualified immunity on the facts as alleged by the nonmoving party.") (citing *Barlow v. Ground,* 943 F.2d 1132, 1136 (9th Cir. 1991)). So, "assuming without deciding" that Ms. Sheehan's constitutional rights were violated, the court must "determine whether those rights were clearly established." *Id.* at 994-95.

The court agrees with Ms. Sheehan's essential analysis (ECF No. 75-1 at 15 ) on this point: Well before the events in question, Ninth Circuit precedent had established that police officers cannot constitutionally meet passive or mild resistance with "non-trivial" force. *See, e.g., Gravelet-Blondin*, 728 F.3d at 1093 ("The right to be free from the application of non-trivial force for engaging in mere passive resistance was clearly established prior to 2008.") (discussing cases). Ms. Sheehan was not entirely passive, of course; she was trying to twist free of Officer Pianta's

1    "pain compliance" hold. But the established constitutional framework also embodies some

2    principle of proportionate response. *Cf. Blankenhorn*, 485 F.3d at 477 ("Even where some force is

3    justified, the amount actually used may be excessive.") (quoting *Santos*, 287 F.3d at 853). Given

4    the situation that Officer Pianta confronted (discussed earlier), and viewing in Ms. Sheehan's favor

5    the disputed points of whether she was throwing punches and whether Officer Pianta's reaction to

6    perceived events was objectively reasonable, it should have been "sufficiently clear [to] a

7    reasonable official" that he could not rightfully slam her to the floor. Put differently (and, again,

8    accepting for present purposes that Ms. Sheehan was not punching Officer Pianta — or at least

9    that she was noncompliant but not a safety risk), throwing her to the floor in these circumstances,

10   in this way, was "'so patently violative of [her] constitutional right that reasonable officials would

11   know without guidance from the courts' that the action was unconstitutional," which is to say that

12   her right to be free from such force was "clearly established." *Mendoza v. Block,* 27 F.3d 1357,

13   1361 (9th Cir. 1994) (quoting *Casteel v. Pieschek,* 3 F.3d 1050, 1053 (7th Cir. 1993)).

15   **3.    *Monell* claim**

16       Local governments can be sued directly under Section 1983 if the public entity maintains a

17   policy or custom that results in a violation of plaintiff's constitutional rights. *Monell*, 436 U.S. at

18   690-91. The Ninth Circuit has explained:

19           There are three ways to show a policy or custom of a municipality: (1) by
         showing "a longstanding practice or custom which constitutes the 'standard
20       operating procedure' of the local government entity;" (2) "by showing that the
         decision-making official was, as a matter of state law, a final policymaking
21       authority whose edicts or acts may fairly be said to represent official policy in the
         area of decision;" or (3) "by showing that an official with final policymaking
22       authority either delegated that authority to, or ratified the decision of, a
         subordinate."

23   *Menotti v. City of Seattle*, 409 F.3d 1113, 1147 (9th Cir. 2005) (quoting *Ulrich v. City and Cnty. of*

24   *San Francisco,* 308 F.3d 968, 984-85 (9th Cir. 2002)). The practice or custom must consist of

25   more than "random acts or isolated events" and instead, must be the result of a "permanent and

26   well-settled practice." *Thompson v. City of Los Angeles*, 885 F.2d 1439, 1443-44 (9th Cir. 1988)

27   *overruled on other grounds by Bull v. City and Cnty. of San Francisco,* 595 F.3d 964 (9th Cir.

28

United States District Court
Northern District of California

2010); *see City of St. Louis v. Praprotnik*, 485 U.S. 112, 127 (1988). Thus, "a single incident of unconstitutional activity is not sufficient to impose liability under *Monell* unless" there is proof that the incident "was caused by an existing, unconstitutional municipal policy . . . ." *City of Oklahoma City v. Tuttle,* 471 U.S. 808, 823-24 (1985).

Because Ms. Sheehan's excessive-force claim against Officer Stolzman fails as a matter of law, so too does her associated *Monell* claim against the OPD. *Dunklin v. Mallinger*, 2013 U.S. Dist. LEXIS 51871, 71-72 (N.D. Cal. Apr. 10, 2013) (citing *Los Angeles v. Heller*, 475 U.S. 796, 799 (1986)). Furthermore, the plaintiff's *Monell* claim against the OPD rests solely on a theory of ratification. (*See* ECF No. 84-1 at 15.) The plaintiff has not otherwise proffered evidence concerning the OPD's policies or their alleged infirmity under *Monell*. Because the court rejects the plaintiff's ratification theory (*see infra*), her *Monell* claim against the OPD fails for this additional reason.

### 3.1 Ratification theory

The plaintiff offers two *Monell* theories. She first argues that BART ratified Officer Pianta's conduct when it concluded, after investigating, that he had acted within BART's use-of-force guidelines. (ECF No. 75-1 at 16; ECF No. 84 at 16.) Put differently, in the plaintiff's view, BART is guilty under *Monell* because it cleared its officer of wrongdoing.

This does not state a viable claim. Finding that an officer acted within policy does not alone amount to *Monell* ratification. *Dunklin*, 2013 U.S. Dist. LEXIS 51871 at 71-72, 80-95; *Garcia v. City of Imperial*, 2010 WL 3911457, *1-*3 (S.D. Cal. Oct. 4, 2010) (discussing cases); *Kanae v. Hodson*, 294 F. Supp. 2d 1179, (D. Haw. 2003). "In other words, in order for there to be [*Monell*] ratification, there must be 'something more' than a single failure to discipline *or the fact that the policymaker concluded that the defendant officer's actions were in keeping with the applicable policies and procedures*." *Garcia*, 2010 WL 3911457 at *2 (citing *Kanae*, 294 F. Supp. 2d at 1191) (emphasis added). The district court in *Kanae* expressed a practical aspect of this rule:

> The law does not say that, whenever an investigative group accepts an officer's version over a victim's differing version, this acceptance establishes a policy for which a municipality may be held liable under § 1983. If that were the law,

United States District Court
Northern District of California

counties might as well never conduct internal investigations and might as well always admit liability. But that is not the law. The law clearly requires "something more."

*Kanae*, 294 F. Supp. 2d at 1191. This "something more" may be an "obviously flawed investigation" into an excessive-force complaint. *See Larez v. City of Los Angeles*, 946 F.2d 630 (9th Cir. 1991). It may exist where the final decision-maker "actively participated" in the challenged conduct. *See Lytle v. Carl*, 382 F.3d 978, 986-88 (9th Cir. 2004). "Extreme factual situations" can also support ratification liability, as in the Fifth Circuit case in which the departmentally unpunished police officers had "poured their gunfire" at the perpetrator's vehicle and "into the person of an innocent bystander." *See Garcia*, 2010 WL 3911457 at *2 (discussing *Grandstaff v. City of Borger*, 767 F.2d 161 (5th Cir. 1985)).

"Here, there are no extreme facts or special circumstances that support a finding of ratification." *Garcia*, 2010 WL 3911457 at *3. Ms. Sheehan premises her *Monell* ratification argument entirely on the fact that BART's post-incident investigations exonerated Officer Pianta. That is legally insufficient. *See Garcia*, 2010 WL 3911457 at *1-*3 (discussing governing law). The court grants summary judgment against Ms. Sheehan's *Monell* claim insofar as it embodies a ratification theory.

### 3.2 "Practice or custom" theory

The plaintiff also argues that BART has an unconstitutional "practice or custom" of exonerating its officers regardless of the circumstances of a particular excessive-force complaint. (ECF No. 84 at 10-13, 16-17.)

BART has submitted evidence explaining the multilayered review processes through which it investigates use-of-force incidents. (ECF No. 83 at 15-18; ECF No. 73 at 14-17.) No one disputes that these processes exist. Nor does anyone deny that BART followed its normal investigative procedures in this case. What Ms. Sheehan argues is that, whatever its processes, in its results BART consistently rubber-stamps and approves its officers' conduct. In her words: "BART's custom and practice is to approve all uses of force as within policy regardless of the circumstances and amount of force used." (ECF No. 84 at 10.) This, in the plaintiff's view, embodies a custom of

United States District Court
Northern District of California

1   sanctioning unconstitutional conduct under *Monell*. (*Id.* at 10-13, 16-17.) Has she raised a genuine

2   issue on this allegation? The court thinks that she has not.

3       Ms. Sheehan and her proposed expert, Richard Ehle, point to two ostensibly critical pieces of

4   testimony on this issue: the testimony of BART Deputy Chief Jeff Jennings and that of Lieutenant

5   Lance Haight. (*See id.* at 10-13.) Part of Deputy Chief Jennings's responsibility is to review the

6   findings of BART use-of-force review board and to ensure that challenged uses of force fall within

7   BART policy and the law.[26] Lieutenant Haight is a supervisor in BART's Internal Affairs

8   Department; Ms. Sheehan's case was assigned to him.[27]

9       The plaintiff argues that Jennings could not recall "a single incident" during his tenure in

10  which BART found a use of force outside policy — which is more pointedly to say, that involved

11  excessive force. (ECF No. 84 at 10.) This is not quite accurate. Jennings repeatedly said that,

12  "[W]e've had some" excessive-force determinations and that "there ha[ve] been some"; but, he

13  said, "I don't recall which ones," and "I don't remember."[28] What is lacking is specificity in

14  Jennings's memory, in other words, not the existence of excessive-force conclusions.

15      With respect to Lieutenant Haight, the plaintiff writes that, of the approximately 100 cases in

16  which Internal Affairs investigated a force complaint during his tenure, "only one investigation . . .

17  , [that] did not involve the use of Tasers or . . . a firearm, concluded" that a use of force was

18  outside policy — and this was a violation only because the officer failed to report it, not because

19  the force was deemed excessive. (ECF No. 84 at 11.) But this, too, is distorted. Haight testified:

20  "[T]here have been a number of cases where officers" were found to have used force that was

21  "objectively unreasonable and outside of policy."[29] He estimated that there were "more than five,

22  [but] less than 10" such cases.[30] That is to say, "approximately" four to five such cases when you

---

[26] Jennings Dep. – ECF No. 84-2 at 102 (pp. 26-27).

[27] Haight Dep. – ECF No. 84-2 at 112 (pp. 62-64).

[28] Jennings Dep. – ECF No. 84-2 at 102 (pp. 26-27).

[29] Haight Dep. – ECF No. 84-2 at 114 (pp. 78-79)).

[30] *Id.* (p. 78).

include incidents involving Tasers and guns.[31] It is unclear why those incidents should be excluded from consideration. They are, after all, excessive-force cases that implicate BART's review process. The plaintiff has given no principled reason for ignoring them in assessing BART's customs and practices.

Finally, there is the opinion of Ms. Sheehan's proffered police-practices expert, Mr. Ehle. Ms. Sheehan cites the following passage from Ehle's report:

> Both Deputy Chief Jennings and Lieutenant Haight stated during their depositions that they were not aware of the BART Police Department having sustained, or found staff out of compliance, in any of the 780 use of force investigations received over the last three years.

> With over 780 use of force investigations within the last three years, it is inconceivable to me that the BART Police Department has not found a single incident out of compliance with policy, or sustained a single complaint of excessive or unnecessary force since 2013. A policy compliance rate of 100% for this volume of use of force investigations appears to be extremely high and not consistent with "industry standards" for metropolitan police agencies in California.

(ECF No. 84 at 12) (citing Ehle Supp. Rep. – ECF No. 84-2 at 123) (footnote omitted). This claim is not supportable. Again, both Jennings and Haight said that *there were some cases* in which BART found its officers to have used excessive force. There is no support for Ehle's zero in this regard and hence none for the 100% compliance rate that he finds damning — and which is meant to buttress the plaintiff's specific argument that "BART's custom and practice is to approve all uses of force." (*See* ECF No. 84 at 10, 12-13.) The court thus disregards this part of Ehle's testimony as insufficient to support a jury question under Rule 56. *See, e.g., Rebel Oil v. Atlantic Richfield Co.*, 51 F.3d 1421, 1436 (9th Cir. 1995) ("When an expert opinion is not supported by sufficient facts to validate it in the eyes of the law, or when indisputable record facts contradict or otherwise render the opinion unreasonable, it cannot support a jury's verdict") (quoting *Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 242 (1993)); *see also* Fed. R. Evid. 702(b) (expert opinion must be "based on sufficient facts and data").

What, then, are we left with on the issue of BART's "policy or custom"? First, the undisputed description of BART's investigative processes. Second, the uncontested proof that BART followed

---

[31] *See id.* at 112-15 (pp. 75-83).

1    those procedures in this case. Third, and last, two witnesses who testified that, in the past few

2    years, and contrary to the plaintiff's depiction, BART *has* occasionally concluded that its officers

3    used excessive force. This evidence does not raise a triable issue on the *Monell* claim that BART

4    has a custom of always exonerating its officers.

5

6    **4.  Fourteenth Amendment**

7        Ms. Sheehan advances a claim against Officers Pianta and Stolzman under the Fourteenth

8    Amendment to the U.S. Constitution based on the same facts that inform her Fourth Amendment

9    excessive-force claim. (3AC – ECF No. 40 at 5 [¶¶ 32-34].) Ms. Sheehan does not specify, but the

10   court presumes that this is a substantive due-process claim. In any event, it is not clear that Ms.

11   Sheehan's claim is cognizable under the Fourteenth Amendment. Allegations of excessive force in

12   the course of an arrest generally are properly analyzed under the Fourth Amendment. The Ninth

13   Circuit has said in this general vein: "[T]he seizure that constitutes arrest 'continues throughout

14   the time the arrestee is in the custody of the arresting officers' and thus any use of excessive force

15   during this extended arrest period is subject to the Fourth Amendment's constraints." *Pierce v.*

16   *Multnomah Cnty., Or.*, 76 F.3d 1032, 10-42-43 (9th Cir. 1996) (citing *Robins v. Harum*, 773 F.2d

17   1004, 1010 (9th Cir. 1985)); *see also Graham*, 490 U.S. at 395 n. 10 (explaining that Fourth

18   Amendment protects against excessive force during arrest). Furthermore, Ms. Sheehan's

19   Fourteenth Amendment claims are rooted in the same facts as her Fourth Amendment excessive-

20   force claim; she alleges no conduct that is unique to her Fourteenth Amendment claim. Moreover,

21   the parties argue only the Fourth Amendment in their respective briefs. (*See* ECF Nos. 73 at 17-18,

22   84 at 14-15.) The court thus dismisses the plaintiff's Fourteenth Amendment claims with

23   prejudice.

24

25   **5.  Claim — Bane Act § 52.1**

26       The plaintiff also claims that, by violating her federal constitutional rights, BART and Officer

27   Pianta also violated her rights under California's Bane Act (Cal. Civ. Code § 52.1). (3AC – ECF

28   No. 40 at 6-7 [¶¶ 41-43].) Because the court denies summary judgment on Ms. Sheehan's

United States District Court
Northern District of California

1    underlying excessive-force claim, it also denies summary judgment on the Bane Act claim. *See*

2    *Ayala v. City of South San Francisco*, No. C 06-02061 WHA, 2007 WL 2070236, *13 (N.D. Cal.

3    July 13, 2007); *Bass v. City of Fremont*, No. C12-4943 TEH, 2013 WL 891090, *5-6 (N.D. Cal.

4    Mar. 8, 2013); *Venegas v. Cnty. of Los Angeles*, 32 Cal. 4th 820, 823, 842 (2004); *see also Bender*

5    *v. Cnty. of Los Angeles,* 217 Cal. App. 4th 968, 978 (2013) ("[W]here an arrest is otherwise lawful,

6    a Bane Act claim based on excessive force "also requires violation of some right other than the

7    plaintiff's Fourth Amendment rights.").

8        Because Ms. Sheehan's excessive-force Bane Act claim survives against Officer Pianta, so too

9    does her claim against BART, which can be vicariously liable. *See Martinez v. Cnty. of Sonoma*,

10    No. 15-cv-01953-JST, 2015 WL 5354071, at *10 (N.D. Cal. Sept. 14, 2015) (recognizing

11    availability of *respondeat superior* liability under the Bane Act); *Mary M. v. City of Los Angeles*,

12    54 Cal. 3d 202, 215 (1991) ("[A] governmental entity can be held vicariously liable when a police

13    officer acting in the course and scope of employment uses excessive force or engages in assaultive

14    conduct.").

15

16                                    **CONCLUSION**

17        The court denies Ms. Sheehan's motion. The court grants the OPD and Officer Stolzman's

18    motion. The claims against the OPD and Officer Stolzman are dismissed with prejudice. The court

19    partly grants and partly denies BART and Officer Pianta's motion. The plaintiff's *Monell* claims

20    against BART and the OPD and Fourteenth Amendment claim against Officer Pianta are dismissed

21    with prejudice. The plaintiff's Fourth Amendment and Bane Act claims will go forward against

22    Officer Pianta consistently with the preceding analysis. The Bane Act claim survives against

23    BART.

24        **IT IS SO ORDERED.**

25        Dated: February 29, 2016

26                                                    _____

27                                                    LAUREL BEELER
                                                     United States Magistrate Judge
28

United States District Court
Northern District of California